1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| LORETO G. GONZALES, | ) | 1:09-CV-01306-GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
|_____| ) | |

18
19

## **BACKGROUND**

20

Plaintiff Loreto G. Gonzales ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplemental Security Income benefits pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

//

//

27
28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 8 & 9.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application on May 10, 2005, alleging disability beginning May 1, 2003. AR 26-27, 88.  His application was denied initially (AR 73-79) and on reconsideration AR 62-72.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 57.  ALJ Stanley R. Hogg, held a hearing on May 14, 2008, and issued an order denying benefits on July 17, 2008.  AR 15-25, 28-37.  Plaintiff requested a review of the decision. On August 13, 2008, the Appeals Council denied review.  AR 5-14.

### Hearing Testimony

ALJ Hogg held a hearing on May 14, 2008, in Redding, California.  Plaintiff appeared and testified.  He was represented by attorney Steven Burniker.  AR 219-243.

Plaintiff was thirty two years old on the date of the hearing.  AR 222.  He completed the Twelfth  grade; however, he received special education services throughout high school.  AR 223.  Plaintiff was placed in special education classes for his entire academic life.  *Id.*  He has difficulty reading, writing, and following instructions.   AR 223, 229-230.  Plaintiff was incarcerated from 2001 to 2003.  AR 227-228.

Plaintiff lives in Corning, California.  AR 238-239.  He is not married, but has two children.  *Id.*  He lives with his fiancé, his daughter, his grandparents and his fiancé's grandparents.  *Id.*  His other daughter lives with Plaintiff's mother and father, whose residence is unknown. AR 238.  AR 26-27.

For fun, Plaintiff spends time with his daughter and plays videos games.  AR 239.  He does not read or own a computer.  AR 223.  He spends must of his time at his house because he does not have any friends.  AR 239.   He does not like interacting with other people in social settings and mainly goes to fast food restaurants when dinning out.  AR 239-240.  He does not have a driver's license and is dependent on his girlfriend or another acquaintances for transportation. AR 239.   He goes grocery shopping with his girlfriend and daughter, but he tries to stay in the car while they shop.  AR 240.  Plaintiff does yard work, such as cleaning and

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

pulling weeds.  AR 232-233, 239.  He has also preformed construction work on his house.  AR 232

Plaintiff last worked in 2004 as a cook at a Kentucky Fried Chicken ("KFC") for one week.  AR 224, 230-232.  He was terminated for walking off the job site after he got into an argument with a manager because he was unable understand instructions on how to properly bread the various types of chicken.   AR 224, 230-231.  Plaintiff has not submitted any applications for work since his termination from KFC.  AR 237

A year prior to working at KFC, Plaintiff worked in a camp processing salmon in Alaska.  AR 224-225.  He worked there for one month but was terminated for smoking a cigar in a non-smoking area.  AR 225.  The longest job Plaintiff has held was for five months working construction in an oil field.  AR 225-226.  His job duties included transporting pumps and parts, and generally assisting other workers as a "helper."  AR 226.  This type of work was very labor intensive, and required Plaintiff to lift 100 pounds.  AR 226, 242.  Plaintiff was terminated because he got into an argument with his boss because he did not follow instructions.  AR 226.

Plaintiff has stabbing pain in his lower back when he breathes.  AR 234.  He experiences this two to three times a week, with an episode generally lasting half a day.  AR 234-235.  He has been treated for back pain and has had it a long time.  AR 233.  Plaintiff takes Naprosyn to manage his pain, which offers only slight relief.  AR 235.  On a scale of one to ten, Plaintiff rates his back pain as a ten without medication, and a seven or eight with medication.  *Id.*

Plaintiff can lift one hundred plus pounds if it is required of him.  AR 235.  He can walk between one half mile and a mile in twenty to twenty-five minutes.  *Id.*  He can stand for twenty to twenty-five minutes, but he experiences shooting pain in his heels.  AR 236.  He has difficulty sitting due to back pain, but he can sit for half-hour to an hour and can bend without much difficulty. AR 236-237.

Dr. Rehman, Plaintiff's primary care physician, sent Plaintiff to a neurologist for his back pain.  The neurologist diagnosed Plaintiff with tendonitis.  AR 241.  Some additional testing was completed but Plaintiff had not received the results at the time of the hearing. *Id*.  He was referred to another specialist by the neurologist.  *Id.*

In addition to his back Pain, Plaintiff suffers from depression and he has anger issues. AR 233, 237.  Plaintiff saw a psychiatrist for two sessions.  AR 228, 237-238.  His treatment was terminated because the psychiatrist did not believe Plaintiff was a candidate for counseling and he suggested Plaintiff try hypnotism.  AR 237-238  The psychiatrist did not prescribe any medication. AR 237.  However, Plaintiff is currently taking Restoril, which was prescribed by Dr. Rehman.  AR 237.  Plaintiff had previously taken Seroquel, but Dr. Rehman terminated his medication because it was not effective and was causing liver damage.  *Id.*

Plaintiff indicated he had an appointment in a few months to see another psychiatrist so that his medication could be evaluated.  AR 242-243.  The ALJ informed both Plaintiff and counsel that he would not be able to hold the record open that long, at which time counsel responded, "[r]ight." AR 243.

**Medical Record**

The entire medical record was reviewed by the Court.  Those records relevant to the issues on appeal are summarized below.

***Sid Cormier, Ph.D.***

On July 12, 2005, Clinical Psychologist Sid Cormier Ph.D., preformed a consultative examination at the request of Department of Social Security to determine Plaintiff's eligibility for disability benefits.  AR 154-163.

Dr. Cormier determined Plaintiff was "completely functionally illiterate" and that Plaintiff's girlfriend had to assist him in completing the history questionnaire.  Although Plaintiff denied being under the influence of mind altering drugs or alcohol at the time of the examination, he admitted to smoking marijuana daily.  While no physical discomfort was obvious, Dr. Cormier observed obvious psychological distress, and Plaintiff demonstrated a combination of verbal and nonverbal behavior consistent with a mixture of hostility, depression and moderate anxiety.  Plaintiff was credible but needed reminders to exert his best efforts while testing. Plaintiff described his mood as typically angry because he usually feels mad at the world. Further, he reported difficulty falling and staying a sleep.  Based on Plaintiff's own personal description and behavior, Dr. Cormier indicated that Plaintiff personified a moderately low

4

energy level.  However, Plaintiff did not experience any hallucinations or delusions.  Dr. Cormier's diagnosed Plaintiff with cannabis abuse, and possibly an unspecified depressive disorder with clear indications of a reading and writing disorder.  AR 154-155.

During testing, Plaintiff indicated that he is capable of showering and dressing himself, shopping, preparing meals, and providing some care for his living situation.  However, he did not have a driver's license because he lost it for excessive speeding.  He also does not pay any bills. Plaintiff described spending a typical day watching television and going outside.  AR 155.

Dr. Cormier opined  that Plaintiff was marginally alert, but that he was grossly oriented to person, place, time, and situation, and his ability of perception was a "bit patchy."  Dr. Cormier could not rule out the possibility that Plaintiff was under the residual effects of long term cannabis abuse.  Plaintiff's thought process flowed at a slower lethargic fashion, which was consistent with mild psychomotor retardation.  Plaintiff's mood appeared to be a mixture of depression, anger, anxiety, and a "guarded affective quality."  AR 156.  His concentration capacity was significantly impaired.  Plaintiff's abstract thinking ability was below average. Both his long-term and working memory appeared to be significantly impaired.  Plaintiff's vocabulary was borderline and arithmetic reasoning skills were marginal.  However, Plaintiff's judgement was basically intact and he seemed to have a fundamental grasp of the consequences of his own and other people's behavior.  Based on Plaintiff's vocabulary, word usage, recorded history, and ability to conceptualize, Dr. Cormier indicated that Plaintiff had borderline intellectual functioning.   AR 156.

On the Wechsler Adult Intelligence Scale III, Plaintiff's verbal IQ score was 71, Performance IQ score was 76, and his full-scale score was 71.  Dr. Cormier found that Plaintiff's current level of functioning was within the lower end of the borderline range, which equaled or surpassed the performance of only three percent of people his age that took the test.  AR 157.  On the Wechsler Memory Scale, Plaintiff was found to be below average in immediate and delayed memory functioning and borderline in working memory functioning.  Plaintiff's Global Assessment of Functioning score was 55. Further, Plaintiff would likely have some significant impairment in complex memory processing. AR 157-158.

Formal memory testing indicated that Plaintiff is probably capable of accepting and remembering simple instructions, but not complex instructions.   Plaintiff also demonstrated obvious impairments regarding sustained concentration, persistence, and pace.  His ability to complete a normal workday or workweek without interruption may be significantly impaired at times because of his borderline intellectual functioning, learning disabilities, and cannabis induced anxiety.  Plaintiff's history and response to stress of the examination suggested that he has a moderate impairment regarding his ability to deal with the typical stress in a competitive work setting.  He has significant impairments with his ability to interact with co-workers and the general public, and would likely need an additional or special supervisor.  Although Plaintiff's borderline intellectual functioning and cannabis related problems may impair his ability to preform complex or detailed tasks, it probably would not impair his ability to perform repetitive tasks.  Additionally, Plaintiff did not have a psychological condition that would impair his ability to maintain regular attendance or perform simplistic work activities. AR 159.

Dr. Cormier concluded that Plaintiff is marginally functional outside of a moderately supportive situation, but that his functional capacity may significantly improve if he were to discontinue his ongoing cannabis abuse and seek professional psychiatric and psychological assistance.  AR 159.

### Rajeswari Kumar, M.D.

On July 16, 2005, state consultative examiner Rajeswari Kumar M.D., a board-certified physician in rehabilitation and pain medicine, preformed a complete orthopedic evaluation. Plaintiff's chief complaints were a history of left shoulder pain, low back pain, knee pain, and chest pain.  Dr. Kumar found no precipitating trauma that would result in Plaintiff's pain.  *Id.* Plaintiff reported he was seen by a chiropractor in 1995 and 1996 when he had x-rays taken and was diagnosed with a deformity of the spine.[3]  Plaintiff denied having any surgery or other treatment, and indicated that he does not take any medication for pain relief.  Plaintiff described

---

[3] No records from the chiropractor or associated x-rays were submitted.

the pain in his lower back as constant and radiating, and the pain in his left knee and shoulder as constant. Plaintiff also complained of intermittent numbness in his left leg. AR 148-152.

The physical examination revealed Plaintiff's range of motion in his shoulders, elbows, wrists, hands, hips, knees, and ankles were all normal, with no tenderness or swelling. Plaintiff's neurologic examination showed normal muscle strength and normal sensation in his upper and lower extremities. Dr. Kumar was unable to ascertain evidence of scoliosis or other spinal deformity and opined that there were no functional limitations and no objective findings to support Plaintiff's multiple subjective complaints. AR 150-151.

### Robert B. Paxton, M.D.

On August 27, 2005, state agency consulting physician, Dr. Robert B. Paxton completed a mental residual functional capacity assessment. Dr. Paxton found that Plaintiff did not have a medical impairment, but that his ability to understand, remember and carry out detailed instructions, and interact with the general public were all moderately impaired. Dr. Paxton indicated that Plaintiff had mild limitations in activities of daily living, mild limitations regarding difficulties in maintaining social functioning, as well as in maintaining concentration, persistence or pace. Plaintiff also had one to two episodes of decompensation. AR 166-179. However, Dr. Paxton found that Plaintiff's ability to work within an ordinary routine without supervision, to get along with co-workers, and complete a normal workday and workweek with interruption were all not significantly limited. All other assessments areas were not significantly limited. AR 160-161. On March 2, 2006, board certified psychiatrist, Alan R. Schrift M.D. reviewed Plaintiff's medical records and affirmed Dr. Paxon's assessment. AR 166.

### Richard C. Dann, M.D.

On February 6, 2006, state agency physician, Dr. Richard C. Dann opined that Plaintiff had many subjective complaints, but there was no objective evidence in support of his claims and Plaintiff had no serve physical impairments. AR 165. Plaintiff did not have any tenderness, spasms of the cervical or lumbar spine. AR 165. His range of motion in his shoulders and knees and his gait were all normal. AR 164. Dr. Dann found Plaintiff to be partially creditable. He described Plaintiff as a young man with very little work history and zero motivation who abuses

1   cannabis on a daily basis.  Dr. Dann found Plaintiff capable of performing simple repetitive

2   tasks.  AR 164-165.

3   ***Syed Rehman M.D.***

4       On May 14, 2007, Dr. Syed Rehman, Plaintiff's primary treating physician, at Del Norte

5   Clinics, examined Plaintiff.  Plaintiff complained of middle to lower back pain, blurry vision,

6   and frequent heat stoke that occurs when he does manual labor which causes him to feel dizzy

7   and light headed.  Plaintiff admitted that he had not seen a doctor for any of his problems and

8   that he takes Ibuprofen to manage his pain.  AR 190.

9       Dr. Rehman's physical examination did not reveal any tenderness in Plaintiff's neck, legs,

10  thighs, or hips areas.  Range of motion in Plaintiff's shoulders, arms, and elbows all appeared to

11  be normal.  Plaintiff exhibited tenderness in the mid and lower spine, but there was no swelling.

12  External and internal rotation of both hips appeared normal.  However, Plaintiff had weak hand

13  grips on both sides which appeared to be more from a lack of effort than any underlying muscle

14  weakness.  AR 191.  Dr. Rehman opined that Plaintiff had chronic pain syndrome with lower

15  back pain, and that the tenderness in Plaintiff's back was very dramatic and worrisome.  Plaintiff

16  was also found to have limited bilateral hip pain.  Plaintiff was prescribed 7.5 mg of Meloxicam

17  to treat his pain.  Dr. Rehman noted that Plaintiff wanted to be on social security disability.  *Id.*

18      On September 12, 2007, Plaintiff returned for a follow-up examination.  Plaintiff

19  continued to complain of significant lower back pain, bilateral hip pain, as well as numbness and

20  weakness in the right arm.  He also complained of depression, and that he gets frustrated and

21  angry.  Dr. Rehman opined that despite Plaintiff's complaints of pain there was no evidence of

22  radiculopathy.  Plaintiff reported that he took Ibuprofen and OxyContin because he could not

23  tolerate Meloxicam.  Dr. Rehman diagnosed Plaintiff with depression and bipolar disorder.

24  Plaintiff also had numbness in his right hand, however, a complete neurological examination was

25  unremarkable.  Plaintiff was prescribed Seroquel and Naprosyn.  Dr. Rehman recommended x-

26  rays of Plaintiff's spine and hip areas.  He also referred Plaintiff to a neurologist for a

27  consultation.  Dr. Rehman indicated that the physical examination was normal.  AR 200.

28

On September 19, 2007, Plaintiff returned again complaining of significant back pain and back and leg spasms. The physical examination was unremarkable. X-rays of Plaintiff's cervical and thoracic spine, and left hip were normal. Images of the lumbar spine showed small osteophyte on the superior endplate of the anterior aspect of L4, but were otherwise normal. The right hip showed an osseous density adjacent to the femoral neck, otherwise the joint appeared unremarkable. Plaintiff's hip examination was also normal. Numbness persisted in Plaintiff's right hand and he had abnormal liver enzymes. Plaintiff was again prescribed Seroquel to treat his depression and anger. Plaintiff was also prescribed Baclofen. AR 199.

On October 12, 2007, Plaintiff was seen by Marilyn Slater, a Family Nurse Practitioner at the Del Norte Clinics. Plaintiff reported he had four to five seizures while sleeping two nights ago. Plaintiff also complained that the Naprosyn upset his stomach and caused a burning sensation in his mid-chest. As a result, the Naprosyn was discontinued, and Plaintiff was prescribed Celebrex and Omeprazole. Ms. Slater indicated that Plaintiff was to follow-up with Dr. Rehman regarding an "EKG" done prior to her examination that revealed a "right bundle-branch block on 1 tracing and a bifascicular block on the second tracing." AR 198.

On December 11, 2007, Plaintiff had a follow-up appointment with Dr. Rehman. Plaintiff continued to complain of chronic low back pain and reported that his hip locked up three weeks previously and he was unable to move. Plaintiff disclosed that he went to the emergency room[4], was given an injection, and was sent home with a prescription for Norco. Dr. Rehman diagnosed Plaintiff with chronic pain syndrome with low back pain and bilateral hip pain. X-rays of Plaintiff's lumbar spine revealed signs of very early degenerative disc disease at "L4-L5." AR 196. However, Dr. Rehman indicated that this was "questionable." *Id.* Dr. Rehman opined that pain in Plaintiff's right wrist appeared to suggest he suffers from de Quervain's tenosynovitis and he was referred to Dr. Hayes, an orthopedic specialist. AR 196. Plaintiff's bipolar disorder was still present because Dr. Rehman indicated that he was not taking any medication to treat it at this time. Dr. Rehman discontinued the Seroquel due to abnormal liver functioning, and changed

---

[4] No records of this emergency room visit were submitted.

1  Plaintiff's prescription to Risperdal.  *Id.*  Plaintiff also requested a refill of his Norco

2  prescription.  *Id.*

3      On January 30, 2008, Plaintiff was seen at a follow-up appointment.  Plaintiff's

4  complaints continued to consist of significant pain in his back, both legs and both knees.

5  Another series of x-rays of Plaintiff's hips were unremarkable.  Plaintiff indicated that he had

6  been taking his prescribed medicine, which consisted of Risperdal, Baclofen and Naprosyn, but

7  that they were not effective at reducing his pain.  Plaintiff was unable to see Dr. Hayes the

8  orthopedic specialist because Dr. Hayes did not accept Medi-Cal patients.  The physical

9  examination revealed that Plaintiff was still in "bad physical shape" and he had an "offensive

10 body odor."  Plaintiff was diagnosed with chronic pain syndrome, although, Dr. Rehman

11 indicated that this was probably psychological pain.  Plaintiff's bipolar disorder was treated with

12 Risperdal, which enabled him to sleep through the night. AR 195.

13             ***Matthew Merliss, M.D.***

14     On December 5, 2007, Matthew Merliss, M.D., at Glenn Medical Center, performed a

15 nerve conduction study and an EMG of Plaintiff's right hand, at the request of Dr. Rehman.  The

16 nerve conduction study showed normal sensory studies of the right hand, and the EMG revealed

17 a normal electromyelogram of the right hand, with normal "insertional" activity in all muscles

18 tested. AR 194.  Dr. Merliss indicated that Plaintiff had tenderness over the extensor tendon of

19 his right thumb with a positive Finklestein's test.  As a result, Dr. Merliss hypothesized that

20 Plaintiff had de Quervain's syndrome in his right wrist.  Dr. Merliss ordered MRI's of Plaintiff's

21 hips due to popping in both hips.  AR 197.

22     On March 18, 2008, Dr. Merliss examined Plaintiff again.  Dr. Merliss indicated that

23 Plaintiff may suffer from de Quervain's tenosynovitis in his right wrist, but the results of the hip

24 MRI were still outstanding.  The examination revealed a "weakly positive" Finkelstein test in his

25 right hand, and a "weakly positive" Patrick's test on Plaintiff's right hand.  AR 193.  He also

26 reiterated the need for Plaintiff to be seen by an orthopedist.  *Id.*

27     On October 15, 2008, Dr. Merliss filled out a "Medical Source Statement of Ability to do

28 Work-Related Activities" for Plaintiff.  Dr. Merliss indicated Plaintiff could lift and carry up to

ten pounds continuously and eleven to fifty pounds frequently, but could never lift or carry 51 to 100 pounds.  AR 212.  Plaintiff could sit for three hours without interruption, stand for four to five hours, and walk four to five hours.  During an eight hour workday, Plaintiff could sit, stand and walk for five hours.  Use of a cane was noted "as needed" due to pain.   Plaintiff's use of his right hand consisted of occasional reaching overhead, handling, fingering, feeling, and pushing/pulling.  Plaintiff was able to perform all other reaching activities with his right hand frequently.  AR 213.  Plaintiff's use of his left hand consisted of occasional reaching, fingering, feeling, and push/pulling, with frequent use of his left hand for handling.  Plaintiff could use both feet frequently. AR 214.  For postural activities, Plaintiff could occasionally climb stairs, ramps and ladders, balance, stoop, and kneel.  However, Plaintiff could never crouch or crawl. AR 215.

Dr. Merliss also indicated various environmental limitations.  Plaintiff could occasionally tolerate unprotected heights, moving mechanical parts, and the operation of a motor vehicle.  However, Plaintiff could never tolerate humidity and wetness, dust, odors, fumes and other pulmonary irritans, or extreme heat and cold.   Dr. Merliss indicated that Plaintiff would work best in a quiet setting and that Plaintiff could not travel without a companion for assistance, nor could he sort, handle or use paper and files. AR 216-217.

### *Phyllis Cullen, M.D.*

On April 14, 2008, Phyllis Cullen M.D. injected an epidural steroid in Plaintiff's back.  The physical examination revealed Plaintiff's motor strength was symmetrical and within normal limits.  His range of motion was mildly restricted due to pain during extreme rotation and extension of his cervical spine.  "Flexion" in Plaintiff's lumbar spine was also painful.  However, rotation and "flexion" in his shoulders and hips were normal and painless.  Plaintiff showed no abnormal movements.  Plaintiff exhibited tenderness at "spinous process," ligaments, and muscles.  AR 210.  Dr. Cullen's impression was that Plaintiff suffered from degenerative disk disease. *Id.*  Additionally,  Dr. Cullen indicated that Plaintiff appeared to be depressed and unmotivated to exercise, which was causing muscle shortening and weakness.  *Id.*  He recommended that Plaintiff participate in an exercise program and seek psychological help in conjunction with antidepressants.  *Id*

1    **ALJ's Findings**

2        The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 10

3    2005, and had severe impairments including: depression, oppositional defiant disorder and

4    borderline intellectual functioning.  AR 20.  Nonetheless, the ALJ determined that Plaintiff's

5    severe impairments did not meet or exceed one of the listed impairments.  AR 21.

6        Based on his review of the medical evidence, the ALJ determined that Plaintiff did not

7    have any impairments based on any exertional limits on his ability to perform work. AR 22.  The

8    ALJ found that Plaintiff was restricted to simple, routine, and unskilled tasks that did not involve

9    frequent dealings with the public or co-workers, but occasional dealings were not precluded.  *Id*.

10   Accordingly, the ALJ determined that Plaintiff was not able to perform any past relevant work.

11   AR 24.  However, given Plaintiff's RFC, the ALJ applied the Medical-Vocational Rules ("the

12   grids") and determined that Plaintiff could perform a significant number of jobs in the national

13   economy.  *Id*.  Therefore, Plaintiff was not disabled as defined by the act.  AR 25.

14                              **SCOPE OF REVIEW**

15       Congress has provided a limited scope of judicial review of the Commissioner's decision

16   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

17   the Court must determine whether the decision of the Commissioner is supported by substantial

18   evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

19   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

20   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

21   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

22   401.  The record as a whole must be considered, weighing both the evidence that supports and

23   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

24   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

25   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

26   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

27   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

28

substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since May 10, 2005, the day of his application; (2) has an impairment or a combination of impairments that is considered "severe" based on 20 C.F.R. § 416.920(c); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in 20 CFR Part 404, Subpart P, Appendix 1(20 C.F.R. §§ 416.920(d), 416.925 and 416.926); (4) could not perform his past relevant work; but (5) could perform jobs that exist in significant numbers in the national economy.  AR 13-20.

Here, Plaintiff argues that: (1) the Appeals Council failed to consider evidence submitted after the ALJ issued the decision; (2) the ALJ failed to provide clear and convincing reasons to reject Plaintiff's subjective pain limitations; (3) the ALJ failed to provide clear and convincing reasons to reject the opinions of Plaintiff's treating physicians; (4) the ALJ failed to consider the limitations imposed by the psychological consultative examiner; and (5) the ALJ's reliance on the grids in lieu of testimony by a vocational expert was improper.

# DISCUSSION

### A.      New Evidence

Plaintiff argues that the Appeals Council did not properly consider the Medical Source Statement of Ability to do Work-Related Activities prepared Dr. Merliss on October 15, 2008. (Doc. 14 at 10).  Defendant responds that the Appeals Council properly considered the opinion and that the new evidence was not material. (Doc. 15 at 7).

The regulations explain Appeals Council review when new and material evidence is submitted:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. 404.970(b).

In addition, this Court must consider evidence added to the record by the Appeals Council even where that evidence was not before the ALJ.  *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).  Pursuant to the provisions of 42 U.S.C. § 405 (g), a case may be remanded to the Secretary if the new evidence submitted is material, and there is good cause for the failure to incorporate it into the record.  In order to be "material," the new evidence must be probative of the claimant's condition as it existed during the relevant time period -- on or before the administrative hearing.  *Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 511 (9th Cir. 1987).  In addition, the claimant must prove to the reviewing court's satisfaction that there exists a "reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination had it been before him."  *Booz v. Secretary of Health and Human Services*, 734 F.2d 1378, 1380 (9th Cir. 1984).  The good cause requirement is satisfied if the claimant could not have obtained the medical evidence at the time of the administrative proceeding, even though the evidence surfaces after the Secretary's final decision.  *See Embry v. Bowen*, 849 F.2d 418, 423-24 (9th Cir. 1988); *Booz*, *supra*, 734 F.2d at 1380.

Here, Plaintiff has not established good cause.  Plaintiff was seen by Dr. Merliss on December 5, 2007 and March 18, 2008, both of which occurred before the hearing date on May 14, 2008.  AR 25,197, 193, 219.  Certainly, an assessment could have been performed and provided to the ALJ before the issuance of the decision.  Instead, Plaintiff waited until after the hearing date and toward the end of the appeal period to obtain the physician's evaluation.  Under these circumstances, the good cause requirement is not satisfied.  Plaintiff could have obtained the medical evidence at the time of the administrative proceeding and he offers no explanation why the evidence was not presented earlier.  *See Embry v. Bowen*, 849 F.2d 418, 423-24 (9th Cir. 1988); *Booz, supra*, 734 F.2d at 1380; *Allen v. Secretary of Health*, 726 F.2d 1470, 1473 (9th Cir. 1984).  "A claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once the claim is denied."  *Clem v. Sullivan*, 894 F. 2d 328, 332 (9th Cir. 1990) citing *Key v. Heckler*, 754 F. 2d 1545, 1551 (9th Cir. 1985).

Finally, Plaintiff has not established that the new evidence is material because Dr. Merliss' report is inconsistent with the evidence submitted by Plaintiff's treating physicians.  For example, Dr. Merliss relies on Plaintiff's hip pain for several of the limitations he imposes. AR 212-213.  However, Dr. Rehman's initial examination notes that the internal and external rotation of Plaintiff's hips were normal, and that Plaintiff's weak hand grip appeared to be more from a lack of effort rather than any underlying muscle weakness.   AR 191, 199.  Moreover, x-rays of Plaintiff's hips taken on January 30, 2008 were also normal.   AR. 195.  Dr. Merliss' report is also inconsistent with Dr. Kumar's orthopedic evaluation, which revealed that Plaintiff exhibited normal range of motion and muscle strength in his hips, and Plaintiff exhibited no functional limitations.  AR 151.  Finally, Dr. Cullen's physical examination, on April 14, 2008, revealed that rotation and "flexion" in Plaintiff's hips were normal and painless.  AR 210.

In light of the above, Plaintiff has not demonstrated that the new report submitted by Dr. Merliss is material when taken in context of the entire record because he failed to establish that the information would have effected the ALJ's decision.  *See Embry v. Bowen*, 849 F.2d 418, 423-24 (9th Cir. 1988); *Booz*, 734 F.2d at 1380. Therefore, the Appeals Council's decision to

uphold the ALJ's decision regarding this issue was proper.   *Ramirez v. Shalala*, 8 F.3d 1449,

1452 (9th Cir. 1993).

### B.      Plaintiff's Subjective Pain Limitations

Plaintiff argues that the ALJ improperly discredited his testimony regarding Plaintiff's

pain in his shoulder, knee, and back. (Doc. 14 at 6-9).  However, the ALJ did not make a

credibility determination regarding Plaintiff's physical conditions because the ALJ found these

impairments were not severe at step two.  AR 20-21.  Therefore, an analysis of these impairments

required no further evaluation and Plaintiff's credibility arguments regarding his complaints of

pain are misplaced.

At step two of the sequential evaluation process, the ALJ must determine whether

Plaintiff suffers from a "severe" impairment.  The regulations define a non-severe impairment as

one that does not significantly limit [the claimant's] physical and mental ability to do basic work

activities.  An impairment is not severe "if the evidence establishes a slight abnormality that has

'no more than a minimal effect on an individual's ability to work.'"  *Smolen v. Chater*, 80 F. 3d

1273, 1290 (9th Cir. 1996).  To satisfy step two's requirement of a severe impairment, the

claimant must prove the existence of a physical or mental impairment by providing medical

evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of

symptoms alone will not suffice.  20 C.F.R. §§ 404.1508; 416.908.  The effects of all symptoms

must be evaluated on the basis of a medically determinable impairment which can be shown to

be the cause of the symptoms.  20 C.F.R. §§ 404.1529, 416.929.  An overly stringent application

of the severity requirement violates the statute by denying benefits to claimants who do meet the

statutory definition of disabled.  *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir. 1994).

The step two inquiry is a *de minimis* screening device to dispose of groundless or

frivolous claims.  *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987).  Further, the ALJ must

consider the combined effect of all of the claimant's impairments on his ability to function,

without regard to whether each alone was sufficiently severe.  42 U.S.C. § 423(d)(2)(B).  The

combined effect "shall be considered throughout the disability determination process.  *Id*.  The

adjudicator's role at step two is further explained by *SSR* 85-28:

16

A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.

*SSR* 85-28.

Here, the ALJ adequately evaluated the medical evidence regarding Plaintiff's complaints of pain in his shoulder, knee and back and properly concluded that these were not severe impairments.  Specifically, the ALJ relied on various physical examinations, radiological tests and nerve conduction studies that were normal and he also properly noted there was no joint pathology, neurological deficits, scoliosis or spinal deformity. AR 20-21.  The evidence relied on by the ALJ supports his finding that Plaintiff's musculoskeletal problems did not impede Plaintiff's basic work activities.  Therefore, the ALJ properly considered Plaintiff's complaints when determining that they were not severe within the meaning of the Regulations. *See Smolen,* 80 F. 3d at 1289-1290; *Bowen,* 482 U.S. at 153-154. Consequently, Plaintiff's argument that the ALJ improperly discredited his testimony related to his alleged physical aliments is without merit.

### C.    Evaluation of Medical and Psychological Evidence

As a preliminary matter, Plaintiff argues that the ALJ credited the non-examining state medical consultants and disregarded the opinions of Plaintiff's examining physicians without adequate explanation.   Specifically, Plaintiff contends that the ALJ improperly rejected the physician opinions regarding Plaintiff's physical impairments.   In support of this argument, Plaintiff merely states that his treating physicians noted that he suffered severe back, hip, and arm pain, as well as tenderness in his spine.   Plaintiff asserts that had the ALJ considered these opinions, he would have concluded that Plaintiff suffered from disabling pain.  (Doc. 14 at 11). However, other than this broad declaration, Plaintiff failed to identify any doctor's findings or reports and did not articulate any specific support for this proposition. Therefore, the Court is unpersuaded by this boilerplate argument as it lacks evidentiary support and appropriate analysis. As noted above, the ALJ properly evaluated the medical evidence of Plaintiff's physical

impairments and relied on Plaintiff's examining and treating physicians reports at step two of the sequential evaluation.

Plaintiff also argues that the ALJ failed to include psychological limitations imposed by the Dr. Cormier, the psychological consultive examiner. (Doc. 14 at 12.)  Specifically, Plaintiff contends the ALJ gave Dr. Cormier's evaluation "significant weight," but the ALJ only adopted some of Dr. Cormier's findings and failed to provide specific and legitimate reasons for failing to address the other limitations. (Doc. 14 at 13.)  The Court agrees.

At the fourth step in the sequential process, the ALJ determines whether the impairment prevents the claimant from performing his or her past work, *i.e.,* whether the claimant has sufficient residual functional capacity to tolerate the demands of any past relevant work. 20 C.F.R. §§ 404.1520(a); 416.920(a).  A claimant's residual functional capacity is the most he can do despite his limitations. 20 C.F.R. § 4040.1545(a).  In determining a claimant's residual functional capacity, an ALJ must assess all the evidence to determine what capacity the claimant has for work despite his or her impairments.  20 C.F.R. §§ 404.1520(a); 416.920(a).

In this case, the ALJ considered many of the psychological limitations imposed by Dr. Cormier, the examining psychologist, and Drs. Paxton and Schrift, the non-examining state agency physicians who assessed Plaintiff's psychological conditions.  AR 23-24, 154-163, 166-179.  The ALJ noted that he found Dr. Cormier's report persuasive, consistent, and well supported by objective findings and accorded it significant weight. AR 23.  The ALJ also found that state agency medical consultants noted moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public.  *Id.*  The ALJ noted that the state agency opinions showed consistency in the record and also were persuasive.  *Id.*  After considering all of the evidence, the ALJ concluded as follows:

> The substantial evidence of record as noted above, confirms that the claimant continues to have problems due to anger issues, borderline functioning, and depression.  Despite these conditions, opinions of examining and non-examining practitioners support findings regarding the claimant's ability to perform work-related activities.  Even with the limitations that the claimant's conditions impose, the record supports that the claimant has the ability to perform work activity at all exertional levels.  He is restricted to simple

repetitive unskilled work tasks that have no frequent dealings with the public, or frequent interaction with co-workers.

AR 23.  A close reading of Dr. Cormier's report demonstrates that the ALJ did not address all of Dr. Cormier's  limitations completely.  For example, the ALJ correctly noted Dr. Cormier "found no psychological condition that would impair the ability to maintain regular attendance or perform simplistic work activities on a consistent basis." *Id*.  However, Dr. Cormier also noted that Plaintiff's "ability to complete a normal workday or workweek without interruption may be significantly impaired at times because of [Plaintiff's] borderline intellectual functioning, learning disabilities, and cannabis induced anxiety." AR 159.  Moreover, Dr. Cormier found that Plaintiff's history and response to stress of the examination suggested that he had a "moderate impairment regarding his ability to deal with the typical stress he may encounter in a competitive work setting." AR 159.  Similarly, Dr. Cormier also noted that Plaintiff demonstrated obvious impairments regarding sustained concentration, persistence, and pace. Finally, Dr. Cormier also found that Plaintiff's history of supervisory conflict indicates that an "associate special" or additional supervision may be required. AR 159.

Although the ALJ limited Plaintiff's RFC to unskilled work tasks that have no frequent dealings with the public or co-workers, the ALJ ignored Plaintiff's limitations with regard to his ability to deal with stress and manage his anxiety, his supervision issues, as well as his impairments regarding concentration, persistence and pace.  The ALJ did not consider these limitations in his RFC, nor did he give reasons for rejecting them.   Therefore, the Court will remand the matter so the ALJ can either incorporate these limitations into Plaintiff's RFC or give reasons for rejecting them.

### D.    *Mental Retardation*

Plaintiff argues that if the ALJ properly considered Dr. Cormier's report then Plaintiff's mental functioning would meet listing diagnosis 12.05(c) which defines mental retardation. However, the ALJ clearly discusses Plaintiff's IQ scores (AR 23), and none of these scores meet any of the requirements under 12.05(c) which provides as follows :

> [m]ental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period

(before age 22)." *Id.* Subsection C requires: first, that a plaintiff have a valid verbal, performance, or full scale IQ of 60 to 70, and second, a physical or other mental impairment imposing additional and significant work-related limitation of function.

*Id.* In this instance, the ALJ clearly considered Plaintiff's IQ scores and properly found that Plaintiff did not have the combination of impairments required by Listing 12.05(c) because neither his verbal IQ of 71, performance IQ of 76, or his full scale IQ of 71 meets the listing requirements. AR 157.

### E.    ALJ's Use of the Grids

Plaintiff argues that the ALJ's use of the grids at step five was inappropriate in light of Plaintiff's non-exertional limitations. (Doc. 14 at 15-16). Defendant argues that the ALJ's finding at step five was supported by substantial evidence. (Doc. 15 at 9-10).

The claimant has the initial burden of proving the existence of a disability within the meaning of the Social Security Act. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). The claimant establishes a prima facie case of disability by showing that a physical or mental impairment prevents him or her from engaging in his or her previous occupation. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). However, once the claimant establishes a prima facie case of disability, the burden of going forward with the evidence shifts to the Secretary. *Hammock v. Bowen*, 867 F.2d 1209 (9th Cir. 1989). The Secretary bears the burden of establishing the existence of alternative jobs available to the claimant, given his or her age, education, and medical-vocational background. In an appropriate case, the Secretary may meet this burden through application of the medical-vocational guidelines set forth in the regulations.[5] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("Appendix 2"); *Heckler v. Campbell*, 461 U.S. 458 (1983); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983). If the guidelines do not accurately describe a claimant's limitations, the Secretary may not rely on them alone to show availability of jobs for the claimant. *Desrosiers v. Secretary*, 846 F.2d 573 (9th Cir. 1988).

---

[5] For any given combination of factors (residual functional capacity, age, education, and work experience), the guidelines direct a conclusion of disability or nondisability when they accurately describe a claimant's particular limitations.

1    When the grids do not match the claimant's qualifications, the ALJ can either (1) use the

2    grids as a framework and make a determination of what work exists that the claimant can

3    perform, or (2) rely on a vocational expert when the claimant has significant non-exertional

4    limitations. *Hoopai v. Asture*, 499 F.3d 1071 (9th Cir. 2007). However, the mere allegation of

5    the presence of a non-exertional impairment is not sufficient to preclude application of the

6    guidelines. Such non-exertional impairment must be found to significantly limit the range of

7    work permitted by a claimant's exertional limitations before the Secretary will be required to

8    obtain expert vocational testimony regarding the availability of other work. *See, e.g., Polny v.*

9    *Bowen*, 864 F.2d 661 (9th Cir. 1988); *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988); *Razey*

10   *v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986) (modified 794 F.2d 1348 (1986)); and *Perminter*

11   *v. Heckler*, 765 F.2d 870 (9th Cir. 1985).

12   As to the application the grids, the ALJ stated:

13   The undersigned notes the Social Security Ruling 85-15 provides a basis for
     conclusion that the occupational base would not be significantly eroded by
14   [Plaintiff's] non-exertional limitations which, as noted above, consist of a
     limitation to simple routine unskilled work that does not involve frequent dealing
15   with the public. Social Security Ruling 85-15 states that the basic demands of
     unskilled work are defined as understanding, remembering, and carrying out
16   simple instructions, responding appropriately to supervision, co-workers, and
     usual work situations, dealing with changes in a routine work setting, and making
17   judgments that are commensurate with the functions of unskilled work, i.e. simple
     work-related decisions, [*sic*] thus borderline intellectual functioning and
18   [Plaintiff's] other emotional difficulties with depression and anger would not have
     a significant impact on his ability to perform a board spectrum of unskilled work.
19   Accordingly, the undersigned finds that [Plaintiff's] non-exertional limitations do
     not significantly erode the occupational base.
20
     AR 24-25.
21
22   Here, the ALJ's reliance on the grids for a non-disability determination in light of

23   Plaintiff's non-exertional limitations was improper. The ALJ found that Plaintiff's borderline

24   intellectual functioning, depression, anger, and ability to understand simple instructions did not

25   significantly impact Plaintiff's ability to perform unskilled work, resulting in finding of "not

26   disabled" under the grids. AR 24-25. However, as previously noted, the ALJ did not address

27   Plaintiff's other non exertional limitations such as his repeated history of supervisory conflict and

28   moderate impairments in dealing with work related stress. These are factors which potentially

could limit Plaintiff's occupational base, which makes the ALJ's conclusion inconsistent with the

language of SSR 85-15.   As such, the case will be remanded so that the ALJ can address these

limitations and take the testimony of a vocational expert if the ALJ adopts these limitations.  *See*

*Cooper v. Sullivan,* 880 F.2d. 1152, 1555 (9th cir. 1989) (citing 20 C.F.R. Part 404, Subpart P,

Appendix 2, § 200.00 (e)(1) ". . . where a claimant suffers solely from a nonexertional

impairment, the grids do not resolve the question,[ ] other testimony is required."); *Poly,* 864

F.2d at 663-664 (grids inapplicable because, although claimant was "capable of performing a

wide range of jobs," he could not perform ones that were "highly stressful," that "require[d]

compression of complex instruction," or "dealing with the public"); *Burkhart,* 856 F.2d at 1341

& n. 4 (grids inapplicable because they did not account for claimant's need to avoid stressful

environments, his inability to regularly use his hands, or his vision problems); *Holohan v.*

*Massanari*, 246 F.3d 1195, 1208-1209 (9th Cir. 2001) (ALJ committed legal error by relying on

grids where ALJ found that claimant had no severe physical impairments and her only severe

impairments were psychiatric).

Defendant's argument that unskilled work "ordinarily involves dealing primarily with

objects rather than data or people" (quoting SSR 85-15) is unpersuasive.  As noted by the ALJ,

SSR 85-15 clearly indicates that responding appropriately to supervisors and dealing with

changes in the work environment are factors the ALJ must consider when determining whether

the occupational base is eroded by Plaintiff's non-exertional impairments.[6]

---

[6] Social Security Ruling 85-15 discusses mental impairments and stress as follows:

Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work.  The basic mental demands of competitive, remunerative, unskilled work included the ability (on a substantial basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with a changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

Determining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult.  This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance fo thoroughness in evaluation in an individualized basis.

1   Moreover, Defendant's reliance on *Summers v. Commissioner of Social Security*, 2009

2   WL 2051653 (E.D. Cal. 2009) is misplaced.  In *Summers*, the Court held that Plaintiff's non-

3   exertional limitation of infrequent public or co-worker contact did not preclude the ALJ from

4   using the Grids because Plaintiff was physically capable of light work and her non-exertional

5   limitations did not affect her ability perform unskilled light work.  *Summers,* 2009 WL 2051653

6   at *23-24.  Here, the ALJ imposed limitations including infrequent contact with co-workers or

7   the public.  However, Plaintiff may have a number of other non-exertional limitations that would

8   preclude the use of the grids including his difficulty accepting supervision and his limited ability

9   to handle stress, manage his anxiety, and deal effectively with changes in the job environment.

10   Based on the above, the Court will remand the case so that the ALJ can adequately

11   consider Dr. Cormier's report, determine whether he will adopt the limitations it contains, and

12   obtain vocational expert testimony if necessary.  Furthermore, the Court notes that Plaintiff's last

13   psychological examination occurred over five years ago.  On remand, the ALJ should consider

14   obtaining an updated psychological examination to determine the current status of Plaintiff's

15   psychological condition.

16   **REMAND**

17   Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

18   power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

19   or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

20   In Social Security cases, the decision to remand to the Commissioner for further proceedings or

21

22   The reaction to the demands of work (stress) is highly individualized, and mental illness is

23   characterized by adverse responses to seemingly trivial circumstances.  The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.  Thus, the mentally

24   impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

25   Because the responses to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands

26   of the job.  A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.

27

28   SSR 85-15.

1  simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

2  599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

3  administrative proceedings, a Social Security case should be remanded.  Where, however, a

4  rehearing would simply delay receipt of benefits, reversal and an award of benefits is

5  appropriate."  *Id.*  (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

6  F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

7  useful purpose would be served by further administrative proceedings, or where the record has

8  been thoroughly developed.").

9       In this case, the Court finds that remand for further proceedings is proper to allow the

10  ALJ to properly review all of the psychological evidence as outlined above and acquire the

11  services of a vocational expert if necessary.

12  ### CONCLUSION

13       Based on the foregoing, the Court finds that the ALJ's decision is not supported by

14  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

15  further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

16  judgment in favor of Loreto G. Gonzales and against Defendant Michael J. Astrue,

17  Commissioner of Social Security.

18

19

20       IT IS SO ORDERED.

21  **Dated:**   __October 28, 2010__          _____ **/s/ Gary S. Austin**_____

22                                                UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28